673 P.2d 55

Charles H. McBRIDE and Sandra McBride, husband and wife, Plaintiffs-appellants and Cross-respondents,

and

Aetna Casualty & Surety Co., and Davey Tree Expert Co., Plaintiffs,

v.

FORD MOTOR CO., and KPS Manufacturing, Defendants-respondents and Cross-appellants.

No. 13441.

Supreme Court of Idaho.

Oct. 27, 1983.

Rehearing Denied Dec. 22, 1983.

John Hepworth, of Hepworth, Nungester & Felton, Twin Falls, for plaintiffs-appellants and cross-respondents.

Robert J. Koontz, and Robert M. Tyler, Jr., of Elam, Burke, Evans, Boyd & Koontz, Boise, for defendants-respondents and cross-appellants Ford Motor Co.

William McCurdy, of Quane, Smith, Howard & Hull, Boise, for defendants-respondents and cross-appellants KPS.

BAKES, Justice.

This products liability action arose from injuries suffered by plaintiff appellant, Charles McBride, on June 24, 1974, while McBride was operating a branch chipping machine in the course of his employment with Davey Tree Expert Co. A blade from a disintegrating radiator fan separated from the motor and struck McBride in the back, severely injuring him. The branch chipping machine involved, known as a B–702 Chipmore Chipper, was designed and manufactured by defendant respondent KPS Manufacturing. It contained a 240 cubic inch power unit, manufactured by defendant respondent Ford Motor Company, which was cooled by a six-blade fan assembly. The 240 power unit was an industrial motor manufactured by Ford and sold to various manufacturers or individuals for a number of different power uses such as pumps, generators, various industrial machine power sources, etc. There was testimony to the effect that for some of the industrial uses for the 240 motor side panels would be appropriate for protective or other purposes, but that for some other purposes they might not. Accordingly, according to Ford, the power unit was manufactured without side panels, the side panels being available as an option depending upon the use to which the motor was to be put.

The record indicates that KPS purchased approximately five hundred of the 240 power units for use in chipping machines which it designed and manufactured, and purchased some side panels to go with them and made them available as an option to the purchasers of the chipping machines. The founder of KPS testified that he purchased the power units without side panels in most instances to facilitate ventilation of the engine. He testified that he informed customers that side panels were optionally available, but that KPS had recommended to Davey Tree that it purchase the chipping machines without the side panels on the power unit, which Davey Tree did. There was also evidence that prior to the accident the plaintiff McBride had complained to Davey Tree that the power unit needed some type of shroud around the power unit to prevent foreign materials from getting into the engine, or to prevent injury to the employees, but Davey Tree refused to order the side panels which were available and have them installed on the machine.

Plaintiff McBride and his wife, together with co-plaintiff Aetna Casualty & Surety Co., filed this action against defendants KPS and Ford, seeking recovery for the personal injuries suffered by McBride in the 1974 accident. The amended complaint was based solely upon the theory of strict liability in tort, alleging that the power unit and/or chipper was defective, and requested damages for the McBrides' injuries and losses as well as reimbursement of $21,-

857.15 in workmen's compensation benefits that Aetna, as surety for Davey Tree, had paid to McBride. Defendants KPS and Ford answered separately, each denying responsibility for the McBrides' injuries, and filing crossclaims against one another seeking contribution and indemnification in the event they were held liable. Upon motion by defendant KPS, the trial court ordered that Davey Tree be brought into the case as an involuntary plaintiff for the purpose of determining whether Davey Tree was negligent, a determination which would, in the event of recovery by McBride, affect Aetna's claim for reimbursement from Ford and KPS for the workmen's compensation benefits paid to McBride.

At trial the expert witnesses for all parties agreed that the fan blades separated and flew off the power unit as a result of metal fatigue. Witnesses for the plaintiffs were of the opinion that the fatigue was caused by excessive resonance produced by the defective design. Witnesses for defendants KPS and Ford, on the other hand, were of the opinion that the fatigue resulted from damage to the fan caused by improper or poor maintenance and misuse of the chipper by Davey Tree.

At the conclusion of trial, the jury returned a special verdict containing the following specific findings: that McBride had not misused the chipper; that Davey Tree was negligent in the maintenance, operation and/or use of the chipper and that such negligence was a proximate cause of the damages sustained by McBride; that Davey Tree misused or failed to properly maintain the chipper and that such misuse was a proximate cause of McBride's damages; that there was no design defect in the Ford 240 engine; that the Chipmore Chipper was not defective when it left the control of KPS; that 100% of the responsibility for McBride's alleged damages was attributable to Davey Tree and 0% to McBride, Ford and KPS; and, that the amount of damages sustained by McBride was $0.

Following entry of judgment, the McBrides filed motions for judgment notwithstanding the verdict and, in the alter-native, for a new trial. Defendants Ford and KPS filed memoranda of costs and attorney fees. Following oral argument and briefing, the district court entered an order denying the McBrides' motions for judgment notwithstanding the verdict and new trial, and denying the defendants' requests for attorney fees under I.C. § 12–121 and discretionary costs under I.R.C.P. 54(d)(1)(D). The district court subsequently entered an order that each party bear its own costs, in effect denying the defendants' requests for costs as a matter of right under I.R.C.P. 54(d)(1)(C). The McBrides appeal from the judgment entered against them and the district court order denying their post-trial motions. Both defendants cross appeal from the court's order denying costs and attorney fees.

I.

On appeal the McBrides urge that the district court erred in denying their motions for judgment notwithstanding the verdict and for new trial; that the district court erred in allocating only four peremptory challenges to the plaintiffs; the court erred in admitting and allowing defendants to use certain photographic evidence at trial; the jury was not properly instructed; and, the form of the special verdict was confusing to the jury and that the jury's answers to the questions in the special verdict form were irreconcilably inconsistent. Because we find no reversible error in any of appellant's allegations of error, we affirm the judgment entered against the McBrides.

A. *Peremptory Challenges*

The McBrides argue that the trial court erred in allocating only four peremptory challenges to the plaintiffs while allocating four peremptory challenges to each of the defendants, KPS and Ford. The McBrides claim that the positions of each of the plaintiffs were sufficiently antagonistic to require that they each should have been allowed to exercise four peremptory challenges.

I.R.C.P. 47(j) vests broad discretion in the trial court in allocating peremptory chal-

lenges among co-parties, and provides, in relevant part:

"In the event there are coparties as plaintiffs, defendants or otherwise, the court shall determine the degree of conflict of interest, if any, between or among the coparties and shall in its discretion allocate the full number of peremptory challenges authorized by this rule to each of the coparties, or apportion the authorized peremptory challenges between and among the coparties, or in its discretion allocate an equal or unequal number of peremptory challenges to each of the coparties."

The trial court reviewed the record and found nothing to indicate an antagonistic position between the plaintiffs. The trial court allowed the McBrides to exercise all of the four peremptory challenges allocated to the plaintiffs. No conflict or antagonism arose between the plaintiffs during the course of trial, the plaintiffs pursuing a uniform approach throughout the proceedings. Under these circumstances, we find no abuse of discretion in the trial court's allocation of peremptory challenges. *See Stoddard v. Nelson*, 99 Idaho 293, 297, 581 P.2d 339, 343 (1978).

### B. *Photographs*

Defendants' Exhibits 124A through –J, consisting of ten photographs of the Davey Tree B–702 chipper taken by Ford's witness, Mr. Charles Stocks, shortly before trial, were admitted over objection at trial. The McBrides argue that since the injury caused by the disintegrating fan blade occurred in 1974, photographs of the same chipper taken just prior to trial in February, 1978, were irrelevant to the issues being tried.

The photographs constituting Defendants' Exhibits 124A through –J were first introduced by defendant Ford on March 9, 1979. On objection by plaintiffs' counsel and questioning by the court, counsel for Ford expressly stated that the photographs were not offered to establish the condition of the chipper at the time of McBride's accident, but were offered to impeach the credibility of plaintiffs' witnesses who had earlier testified that Davey Tree properly and consistently followed a program of maintenance of its machines. The court overruled plaintiffs' objections and admitted the photographs, warning the jury that they "[did] not in any way purport to represent the condition of B–702, that particular chipper, at the time of Mr. McBride's injury." The court again admonished the jury later in the day as to the limitation on the admissibility of the photographs.[1]

This Court has long held that "evidence inadmissible for one purpose may nevertheless be admissible for another purpose." *Erikson v. Nationwide Mutual Ins. Co.*, 97 Idaho 288, 291, 543 P.2d 841, 844 (1975); *see Owen v. Burcham*, 100 Idaho 441, 599 P.2d 1012 (1979). Personnel of Davey Tree had testified that Davey Tree enforced a good maintenance program, and that both at the time of the accident and just prior to the trial the B–702 chipper was in good operating condition. Defendants' Exhibits 124A through –J, which showed the chipper in a state of disrepair shortly before trial, were clearly admissible for the purpose of impeaching that testimony.[2] Having limited the jury's consideration of

---

1. Prior to a recess later in the day, the court cautioned:

"Ladies and Gentlemen, you recall when I admitted Exhibit 124, the ten Polaroid photographs that Mr. Stocks had taken, I advised you that they were concerned only with the testimony of Davey Tree persons concerning their maintenance standards at the present time. And also Mr. Stocks' testimony concerning these three chippers that he found in Boise relates only to the Davey Tree Company standard of maintenance at the present time. It does not in any way relate to the maintenance which Mr. McBride maintained on his machine or the condition of that machine at that time."

2. The photographs reflected that an engine mounting bolt was missing; a clevis pin which attached the throttle cable to the governor was almost completely out; the governor belt was inside out and extremely worn; the shroud and radiator were loose, and the shroud was dented; there were small branches inside the engine compartment; the fan blades showed evidence of having been hit, and one fan blade was bent.

the photographs to impeachment purposes, the court did not err in admitting the exhibits.

The McBrides also argue that regardless of whether the district court properly admitted the photographs for impeachment purposes, it erred in later abandoning its limitation on the use of the photographs. Defense witness Karl Schoeppner referred to Exhibits 124A through –J during his testimony on March 14, 1979, while describing the position of the fan assembly and its covering shroud. When defendants' counsel requested permission to show photographs 124H and –J to the jury to illustrate the testimony as to the alignment of the fan and shroud in relation to the feed chute on the chipper, and to generally characterize the configuration of the chipper, plaintiffs objected on the ground that the photographs had been admitted for a limited purpose. Although the trial court stated that it did not recall any limitation on the use of the photographs, for the reasons discussed below we hold that the trial court did not commit error by allowing the photographs to be used for the purpose of illustrating the chipper's configuration.

First, although the district court was mistaken as to the existence of an earlier limitation on the use of the photographs, the use sought to be made of the photographs by defendant KPS to characterize the general configuration of the Chipmore chipper, was not inconsistent with the court's previous direction that the photographs were not to be considered as evidence of the condition of the B–702 chipper at the time of appellant's injury.

Second, defendants' Exhibits 124H and –J are not dissimilar to photographs introduced by plaintiffs and admitted as Plaintiffs' Exhibit No. 1, which contained five photographs of the B–702 chipper involved in this action. Plaintiffs' counsel stated that the photographs constituting Plaintiffs' Exhibit No. 1 were taken some time after the accident, but that counsel had stipulated to the admission of the exhibit for illustrative purposes. Plaintiffs' counsel had those pictures shown to the jury before calling the first witness.

Other photographs representative of the configuration of Chipmore chippers were offered by the defendants and admitted as Defendants' Exhibits 201 and 211. Defendants' Exhibit 201, a photograph of a single chipper, was offered by counsel for defendant KPS "for illustrative purposes of the general configuration," and to "illustrate the location and the configuration of the engine and the engine shroud at this time." McBrides' counsel stated that "[f]or illustrative purposes, I have no objection," and the court admitted the exhibit.

Defendants' Exhibit No. 211 included photographs of two Chipmore chippers not involved in this action, and one of a Chipmore chipper's cutting cylinder positioned between the feed chute and discharge chute. Mr. Karl Schoeppner, Jr., testifying at the time this exhibit was introduced, stated that the "basic configuration [of the pictured chippers] is equivalent to that of a Davey Tree chipper." Plaintiffs raised no objection to the admission of Defendants' Exhibit No. 211.

With all of the other photographs of the chipper in question or similar chippers before the jury, the fact that the trial court allowed defendant KPS to show Defendants' Exhibits 124H and –J to the jury "to show, to illustrate Mr. Schoeppner's testimony as to the location of the fan and shroud" and the "alignment in relation to the feed chute portion" is of little consequence. As the trial court noted, Defendants' Exhibits 124A through –J had already been "admitted in evidence and [would] eventually go to the jury in any event." It was not error for the trial court to permit Defendants' Exhibits 124A through –J to be shown to the jury during Mr. Schoeppner's testimony.

## C. Instructions

We turn next to the McBrides' contentions that the trial court failed to adequately instruct the jury on plaintiffs' theory of strict liability. In particular, the McBrides argue that the court erred in refusing to

give requested instructions 18, 24, A, 25, 30, 28, 29, B and 17.

On appeal the instructions must be viewed as a whole to determine whether the jury was properly and adequately instructed. *Davis v. Bushnell,* 93 Idaho 528, 465 P.2d 652 (1970); *Blaine v. Byers,* 91 Idaho 665, 429 P.2d 397 (1967). If the court's instructions, considered as a whole, fairly and adequately present the issues and state the applicable law, then no error is committed. *See Pacific Northwest Pipeline Corp. v. Waller,* 80 Idaho 105, 326 P.2d 388 (1958); *Union Seed Co. of Burley v. Savage,* 76 Idaho 432, 283 P.2d 918 (1955); *Koehler v. Stenerson,* 74 Idaho 281, 260 P.2d 1101 (1953). We are of the opinion that the court's instructions, taken as a whole, correctly instructed the jury on the law applicable to the issues. Nevertheless, we will consider each of appellants' assertions of error separately.

The plaintiffs assert error in the court's refusal to give their requested instruction 18. However, as the trial court noted, requested instruction 18, which sets forth the requirements of the Restatement (Second) of Torts, § 402A was fully covered by given instruction 11. The refusal to give a particular requested instruction is not erroneous where the substance of the proposed instruction is covered elsewhere in the instructions given. *See Garrett v. Nobles,* 102 Idaho 369, 630 P.2d 656 (1981); *Mann v. Gonzales,* 100 Idaho 769, 605 P.2d 947 (1980).

Error is also asserted in the court's refusal to give plaintiffs' requested instruction 24 which stated essentially that a product may be defective due not only to defective materials or parts, but also because of defective design. However, as the trial court noted on the requested instruction, that subject was adequately covered by the other instructions of the court. First, at the beginning of the trial, the trial court advised the jury that the plaintiffs' claim was based both upon a defect in design and defects in manufacture. The court also advised the jury that the defendants denied that their designs were in any way defective. Thereafter, the jury heard testimony for nearly three weeks, a substantial portion of which was directed toward the plaintiffs' main allegation that the defective condition asserted in their claim was a design defect. The defense testimony was directed toward proving that the cause of the fan blade disintegrating was not because of a design defect or other manufacturing defect, but because of misuse or poor maintenance. After hearing all that testimony, which was focused directly upon plaintiffs' claim that the alleged defective condition was a design defect, the court, in its given instruction 11, instructed the jury as to the elements of a strict liability cause of action, including the requirement "that the product was in a defective condition unreasonably dangerous to a user or consumer when it left the control of the defendant." Additionally, the court's given instruction 16 distinguished between a defect in materials or parts, and a defect in design. Question 7 on the special verdict specifically asked the jury whether or not there was a "design defect" in the machine. Accordingly, we conclude that the jury was adequately instructed on the general principles of law applicable to products liability cases and plaintiffs' factual theory of defective design. Plaintiffs' requested instruction 24 was adequately covered by the instructions and directions given to the jury, as the court correctly noted on the bottom of it.

Plaintiffs' requested instruction A, which was directed toward one of the evidentiary bases upon which the plaintiffs claimed that the design was defective, *i.e.,* failure to include safety devices, was covered by the trial court's general instructions regarding the elements of a strict liability cause of action. The jury was clearly aware of the plaintiffs' various factual theories of why an alleged design defect occurred, only one of which was the failure to include safety devices. The trial court did not err in giving a general instruction regarding the elements of a strict liability cause of action and in not singling out one particular evidentiary claim as to why the

particular design was defective, *i.e.,* failure to include safety devices.

Next, plaintiffs assert error in the failure to give their requested instructions 25 and 30 pertaining to the duty of a manufacturer to give warnings. This argument is without merit for two reasons. First, appellants raised no specific objection to the court's failure to give the requested instructions, as then required by I.R.C.P. 51(a), and thus are precluded from raising this argument on appeal. *See Quincy v. Joint School Dist. No. 41,* 102 Idaho 764, 769, 640 P.2d 304, 309 (1982); *Stoddard v. Nelson,* 99 Idaho 293, 298, 581 P.2d 339, 344 (1978). Additionally, those requested instructions failed to include the *caveat* clearly mandated by *Rindlisbaker v. Wilson,* 95 Idaho 752, 519 P.2d 421 (1974), wherein this Court stated that such a duty to warn "is limited to situations wherein the danger is not obvious." The requested instructions did not include that *caveat.* Additionally, the trial court's given instruction 16 covered the duty to warn of unsafe conditions and included the *Rindlisbaker caveat* that "a warning is not required, however, if the danger is obvious or actually known to the user." Accordingly, no error was committed in refusing to give instructions 25 and 30.

Plaintiffs next assert error in the failure to give instruction 28 which would have instructed the jury that evidence of the presence of a defect in a product would permit the inference that the defect made the product unreasonably dangerous. However, we agree with the Minnesota Supreme Court's statement in *Boutang v. Twin City Motor Bus Co.,* 248 Minn. 240, 80 N.W.2d 30, 36 (1975), that "the drawing of inferences is a matter of common sense logic and reasoning which the jurors will normally use without express direction or guidance of the court." The district court committed no error in refusing instruction 28.

Plaintiffs next assert error in the trial court's refusal to give requested instruction 29 which attempted to define the term "unreasonably dangerous." However,

the substance of instruction 29 was covered in given instruction 14, both of which referred to a defective condition not "contemplated by the ordinary or ultimate consumer . . . ." Moreover, several courts have held that the term "unreasonably dangerous" is itself a definitional term which does not need additional defining. *Gaenzele v. Wallace Products Corp.,* 39 Ill.App.3d 93, 350 N.E.2d 571, 576 (1976); *Pyatt v. Engel Equipment, Inc.,* 17 Ill.App.3d 1070, 309 N.E.2d 225 (1974).

Plaintiffs' requested instruction B would have instructed the jury that "a manufacturer must foresee some degree of misuse of its products, either by the user or by third parties, and must take reasonable precaution to minimize harm that may result from misuse or abuse." However, that is not the law in Idaho. *Shields v. Morton Chemical Co.,* 95 Idaho 674, 677, 518 P.2d 857, 860 (1974) (which held that misuse of a product is an affirmative defense to a strict liability action against the manufacturer or other distributor). Accordingly, the trial court did not err in refusing instruction B.

Finally, the plaintiffs allege error in refusing to give plaintiffs' requested instruction 17 describing the theories of some of the parties to the action, and instructing the jury as to which questions on the special verdict form relate to which particular theory of liability. However, plaintiffs' requested instruction 17 was incomplete since it did not include reference to the negligence of Davey Tree, which was properly included in the court's special verdict. Furthermore, given instruction 7 specifically advised the jury that the negligence instruction "refers to the cross claims between Ford Motor and KPS and not as a defense as to plaintiffs' claims," thereby accomplishing the purpose which plaintiffs now assert requested instruction 17 would have served. Accordingly, no error was committed in refusing requested instruction 17.

In addition to the foregoing asserted error in the refusal to give requested instructions, the plaintiffs also assert that the trial

**762**

court committed prejudicial error in giving instructions 8, 10 and 11.

As to given instruction 8, which stated that "the mere fact that an accident occurred, standing alone, is no evidence of any fault on the part of the defendant or that there was any defect in the product manufactured by that defendant," the plaintiffs assert that the Idaho Jury Instruction Manual (IDJI) recommends that no such instruction be given. However, at the instruction conference before the trial court the plaintiffs did not complain about instruction 8 *per se,* which they stated to the court "is a correct statement of the law," but argued that "when read against instruction 14 appears to be inconsistent." However, they are not inconsistent. Instruction 14 instructed the jury that "[p]roof of a *malfunction* of the product is circumstantial evidence of a defect in that product" (emphasis added), while instruction 8 instructed the jury that "the mere fact that an · *accident* occurred, standing alone, is no evidence of any fault on the part of the defendant or that there was any defect in the product manufactured by that defendant." (Emphasis added.) Instruction 14 referred to proof of a malfunction as circumstantial evidence, while instruction 8 referred to proof of an accident as not being evidence of a defect. The two instructions are not inconsistent, and because the jury was instructed to consider the instructions as a whole, plaintiffs allegation of error is without merit.

Plaintiffs next assert error in the giving of instruction 10 that "[a] manufacturer is entitled to assume that its product will be properly maintained." Aside from the fact that no objection was raised as to that instruction at trial as required by I.R. C.P. 51(a)(1), it is a correct statement of the law. *Mitchell v. Ford Motor Co.,* 533 F.2d 19 (1st Cir.1976); *Murray v. Bullard Co.,* 110 N.H. 220, 265 A.2d 309 (1970); *Foster v. Marshall,* 341 So.2d 1354 (La.App.1977).

Finally, plaintiffs assert that the trial court committed prejudicial error in giving instruction 11 which essentially instructed the jury on the rule of strict liability from the Restatement (Second) of Torts, § 402A (1965), as adopted by this Court in *Shields v. Morton Chemical Co., supra.* The plaintiffs ask us to adopt the rule in the California decision of *Cronin v. J.B.E. Olson Corp.,* 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153 (1972), which rejected the portion of the Restatement rule adopted in *Shields* requiring the plaintiff to prove not only that the product was in a defective condition, but also that it was unreasonably dangerous. However, *Cronin's* elimination of the unreasonably dangerous requirement is inconsistent with our prior decisions in *Shields v. Morton Chemical Co., supra,* and *Farmer v. International Harvester Co.,* 97 Idaho 742, 553 P.2d 1306 (1976), and has been rejected by nearly every other jurisdiction which has considered the question, together with innumerable legal commentators. Accordingly, we reject the *Cronin* case and its elimination of the "unreasonably dangerous" proof requirement. Furthermore, plaintiffs' requested instruction 18 and plaintiffs' requested special verdict form both contained the language "product in a defective condition unreasonably dangerous to the user . . . ," and our cases clearly reject the notion that one may assert as error the court's instructing in language which that person has specifically requested the court to give, regardless of whether it was a correct statement of the law. *See Anderson v. Gailey,* 97 Idaho 813, 823, 555 P.2d 144, 154 (1976).

When viewed as a whole, the trial court's instructions adequately and correctly stated the issues and relevant law, and the court's refusal to give certain of plaintiffs' requested instructions and the giving of other instructions assigned as error by the McBrides was not error. *See Garrett v. Nobles,* 102 Idaho 369, 630 P.2d 656 (1981); *Annau v. Schutte,* 96 Idaho 704, 535 P.2d 1095 (1975); *Davis v. Bushnell,* 93 Idaho 528, 465 P.2d 652 (1970).

### D. *Special Verdict*

The McBrides also allege that the special verdict form was confusing and

the jury's answers to the questions contained in the special verdict were irreconcilably inconsistent, and that a new trial should have been granted on that basis. Specifically, the McBrides argue that the jury's finding that McBride did not misuse the chipper was inconsistent with its findings that Davey Tree was negligent and misused or failed to properly maintain the chipper. The basic premise of this argument is that McBride was the only one to ever perform maintenance or to use the chipper from the time of its purchase in 1971 until June of 1974 when the accident occurred. However, the record discloses that McBride was the foreman for only approximately the last fourteen months prior to the accident, and while he had the responsibility for the maintenance and use, the record established that others performed much of that work. Reviewing the evidence most favorably to the prevailing party below, and drawing all reasonable inferences in their favor, as we must, *Higginson v. Westergard,* 100 Idaho 687, 604 P.2d 51 (1979); *Furness v. Park,* 98 Idaho 617, 570 P.2d 854 (1977); *Brizendine v. Nampa Meridian Irr. Dist.,* 97 Idaho 580, 548 P.2d 80 (1976), the record discloses that, according to the expert testimony of the respondents' witnesses, the primary and most probable cause of the fan disintegrating was that it had been bent some time in the past as a result of negligent maintenance or misuse. The experts testified that the bending of a fan blade out of alignment will result in setting up a resonance which would ultimately result in metal fatigue and the fan flying apart. There was testimony that the employees of Davey Tree used a large wrench in tightening the fan belt which could have resulted in one or more of the blades of the fan having been bent. Also, there was evidence of tree limbs and other debris getting into the engine compartment which could damage or bend the blades. An examination of the maintenance records and the testimony of Davey Tree employees was that the machine needed to be serviced approximately every two weeks, but the written maintenance records indicate that shortly before trial the machine had gone nearly ninety days without any maintenance. The record further contains evidence that: at least one of McBride's crew members was at times responsible for checking the oil and gas in the chipper and for examining the chipper chute for obstructions; McBride did not perform tuneups and service work; and, McBride could not authorize repairs or any maintenance costing in excess of $25 without authorization from Davey Tree's account manager or the head office. The record contains evidence that the chipper was left outside overnight and that it was being misused as a garbage receptacle. Finally, the record contains expert testimony that it could have taken an extended period of time for metal fatigue to develop to the point of causing a failure. Therefore, the record supports a conclusion that the accident resulted from misuse or improper maintenance of the machine, even though McBride himself was not necessarily responsible for that misuse. Accordingly, the trial court did not err in refusing to grant a new trial on the ground that the jury's answers to questions 3 and 5 of the special verdict were irreconcilably inconsistent.

■ The McBrides also argue that the special verdict form was confusing because the trial court failed to define the term "misuse" found in questions 1 and 5. Like the term "unreasonably dangerous," the term "misuse" is self defining. Even if it were not, the McBrides did not request an instruction defining misuse and are precluded from arguing on appeal that the failure to define misuse was erroneous. *See Holland v. Peterson,* 95 Idaho 728, 730, 518 P.2d 1190, 1192 (1974).

■ The appellants also argue that the form of the special verdict was confusing in that it required an answer to the question of whether Davey Tree was negligent. However, the question regarding Davey Tree's negligence was properly included in the special verdict. This Court has previously held that where an employer's negligence, together with the negligence of a third party non-employer tortfeasor, concurrently contributed to the injury of an

employee, neither the employer nor its surety can obtain reimbursement for workmen's compensation benefits from the employee who recovers damages from the third party tortfeasor. *See Liberty Mutual Ins. Co. v. Adams,* 91 Idaho 151, 417 P.2d 417 (1966). We extended this rule in *Tucker v. Union Oil Co.,* 100 Idaho 590, 603 P.2d 156 (1979), to hold that a third party tortfeasor is entitled to have the judgment against it reduced by the amount of workmen's compensation benefits paid to the employee where the employer had also been found guilty of negligence. In this case, the plaintiff Aetna, as insurer of Davey Tree, sought reimbursement from Ford and KPS for the amount of workmen's compensation benefits paid to McBride, $21,857.15. Under the above stated rule, even if Ford and KPS had been found liable on McBride's strict liability claim, they would have been entitled to offset the $21,857.15 against Aetna's claim because of Davey Tree's negligence. Consequently, the question concerning Davey Tree's negligence in the special verdict form was proper and necessary for a complete determination of the rights and obligations of the parties to this action. *See also McDrummond v. Montgomery Elevator Co.,* 97 Idaho 679, 551 P.2d 966 (1976); *Liberty Mutual Ins. Co. v. Adams, supra.*

 The McBrides argue that the answers to the special verdict questions demonstrate the jury's confusion in that the jury applied negligence against McBride even though negligence is not a defense to a strict liability action. However, as discussed above, the jury specifically found that McBride did not misuse the chipper, but that Davey Tree did misuse or fail to properly maintain the chipper, showing that the jury distinguished between the actions of McBride and those of Davey Tree. Furthermore, given instruction 7 set forth the principles of negligence and specifically stated: "This instruction refers to the crossclaims between Ford Motor and KPS and is not a defense to plaintiff's claims." There is nothing to support appellants' claim that the jury was confused by the question regarding Davey Tree's negligence

or that the jury applied negligence against the McBrides to defeat their claims.

Finally, the McBrides argue that the jury's determination of damages in the amount of $0 sufficiently illustrates that the jury was confused by the special verdict form. The McBrides assert that it is undisputed that McBride was damaged at least in the amount of $21,857.15, and that in finding his damages to be $0 the jury disregarded instruction number 25 which provided, in part, that the jury was "not to consider the amount paid to him [McBride] by Aetna Casualty and Surety Co." in determining McBride's damages.

 Assuming that McBride had established damages, there is an explanation of the jury's verdict setting a determination that McBride was damaged in the amount of $0. The pleadings informed the jury that Aetna, as surety for Davey Tree, was seeking reimbursement for the workmen's compensation benefits paid to McBride. Certainly the jury knew that Aetna was not entitled to be reimbursed by Davey Tree, its insured and, finding no other liability, set the amount of damages at $0. Furthermore, even if the jury disregarded instruction number 25, no prejudice would have resulted to the McBrides since the jury's determination of damages was, or should have been, totally independent of its conclusion that the chipper was not defective.

### E. Judgment N.O.V.

 The McBrides claim that the trial court erred in denying their motion for judgment notwithstanding the verdict. As discussed previously, the record contains substantial evidence to support the jury's finding that Davey Tree misused or failed to maintain the chipper. On a motion for judgment notwithstanding the verdict, the moving party admits the truth of the adverse evidence contained in the record and every inference that may legitimately be drawn therefrom. *See Rowett v. Kelly Canyon Ski Hill, Inc.,* 102 Idaho 708, 709, 639 P.2d 6, 7 (1981). The motion must be denied if there is substantial evidence to support the verdict. *See Barlow v. Interna-*

*tional Harvester Co.,* 95 Idaho 881, 886, 522 P.2d 1102, 1107 (1974). There was very substantial and competent evidence in the record to support the jury's finding that Davey Tree misused or failed to maintain the chipper, and accordingly the trial court did not err in denying the plaintiffs' motion for judgment notwithstanding the verdict.

No reversible error having been shown in this record, we affirm the judgment entered against the McBrides and in favor of Ford and KPS on the strict liability claims.

## II

■ On cross appeal, defendant respondents Ford and KPS both assert error in the trial court's refusal to grant their motions for attorney fees under I.C. § 12–121 and mandatory costs under I.R.C.P. 54(d)(1)(C). We find no abuse of discretion in the court's refusal to award attorney fees, *see* I.R.C.P. 54(e)(1) and *Minich v. Gem State Developers, Inc.,* 99 Idaho 911, 591 P.2d 1078 (1979). However, the trial court's refusal to grant "costs as a matter of right" under I.R.C.P. 54(d)(1)(C) was error. I.R.C.P. 54(d) is a major departure from the comparable federal rule. It sets up two basic categories of costs allowable to a prevailing party, those which that party receives as a matter of right, I.R.C.P. 54(d)(1)(C), and those which the court in its discretion may allow "upon a showing that said costs were necessary and exceptional costs reasonably incurred, and should in the interest of justice be assessed against the adverse party," I.R.C.P. 54(d)(1)(D). While the trial court did not err in denying discretionary costs under 54(d)(1)(D), as to those costs falling under 54(d)(1)(C), "Costs as a Matter of Right," the trial court erred in denying those costs to the defendants who were the prevailing parties in defending against the plaintiffs' complaint. Accordingly, the trial court's order denying defendants their "Costs as a Matter of Right" is reversed, and the cause remanded to the trial court for a determination of those costs to the defendants KPS and Ford under I.R.C.P. 54(d)(1)(C).

The judgment of the district court is affirmed in all respects except as to the de-

fendants-cross appellants' costs under I.R.C.P. 54(d)(1)(C). As to that cross appeal the judgment of the district court is reversed and remanded for further proceedings.

Costs on appeal to respondents-cross appellants. No attorney fees allowed.

SHEPARD, J., and McFADDEN, J. Pro Tem., concur.

DONALDSON, C.J., concurs in result.

BISTLINE, Justice, dissenting in part and concurring in part.

The plaintiffs-appellants were denied a fair trial in this case because of errors in crucial evidentiary rulings and errors in instructions. Upon the record before us, this case should be remanded for a new trial because of those errors.

The majority today holds in Part I–A that "the court's instructions, taken as a whole, correctly instructed the jury on the law applicable to the issues." *Supra* at 62. However, the trial court failed in its duty to instruct the jury on the law of strict liability, which comprised the hub of plaintiffs' case. Therefore, reversible error was committed and a new trial must be ordered. *See Everton v. Blair,* 99 Idaho 14, 16, 576 P.2d 585, 587 (1978).

The plaintiffs requested that the trial court provide complete instructions to the jury concerning the law of strict liability. Specifically, the plaintiffs requested that the court instruct the jury as to when a product is legally defective and define the troublesome phrase "unreasonably dangerous" as it has come to be interpreted under Idaho law. The following instructions form the core of plaintiffs' requested legal instruction to the jury:

Requested Instruction # 18 provided:

"One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm

thereby caused to the ultimate user or consumer, or to his property, if ...."[1]

Requested Instruction # 24 provided:

"A product may be defective, within the meaning of that term as used in the rule of strict liability, not only when it contains unsafe or defective materials or parts, but also if any part of its fundamental design exposes users or bystanders to an unreasonable risk of physical injury."

Requested Instruction A provided:

"A product may be defective in its design if it lacks safety devices necessary to its reasonable safety."

Requested Instruction # 28 provided:

"Ordinarily, evidence indicating the presence of a defect in the product or permitting its inference under all the circumstances will prove or permit the inference to be drawn that the defective condition of the product made it unreasonably dangerous."

Requested Instruction # 29 provided:

"A product is unreasonably dangerous if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who uses it, with the ordinary knowledge common to those who use the product as to its characteristics."

In this way, then, the plaintiff laid out and defined the various elements of his case in a way that the jury could clearly have understood and applied.

However, the majority today has ruled that much less than this is required. The majority relies principally on two instructions given by the trial court for its finding that "the substance of the plaintiffs' proposed instructions [are] covered elsewhere." *Supra* at 62. First the majority points to given instruction 11, which provides:

"To recover under the theory of strict liability, plaintiff has the burden of proving each of the following as more probably true than not:

"(1) That the defendant is engaged in the business of selling, manufacturing or assembling a product ...;

"(2) That the product was in a defective condition unreasonably dangerous to the user or consumer when it left the control of the defendant;

"(3) That the defect was the proximate cause of injuries;

"(4) The nature and extent of the injuries and damages, if any, sustained by plaintiff."

Second, the majority relies upon given instruction A, which provides:

"A product is in a defective condition if, at the time it leaves the seller's hands, it is in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.

"The plaintiffs need not prove a specific defect to meet their burden of proving that a product is defective.

"A defect may be proven by either direct or circumstantial evidence. Proof of a malfunction of the product is circumstantial evidence of a defect in that product."

It is clear that plaintiffs' requested instruction 18 is fully covered by the court's given instruction 11. However, the instructions given by the court are woefully inadequate in explaining when a product is defective—especially with regard to design defects resulting from lack of safety devices, a central element of the plaintiffs' case—and what is meant by the term "unreasonably dangerous." With regard to the plaintiffs' claim that the jury was not instructed as to what exactly comprises a design defect, the majority contents itself with noting the following: (1) that the trial court advised the jury at the beginning of the trial that the plaintiffs' claim was based both upon a defect in design and manufacture; (2) that the trial court advised the jury that the defendants denied that their designs were defective; (3) that the jury heard extensive testimony directed at this

1. The instructions thereafter recited the familiar elements from § 402A of the Restatement,

Torts 2d.

very issue of whether there existed a design defect; and (4) that instruction 11 included among its elements of a strict liability cause of action the requirement "that the product was in a defective condition unreasonably dangerous to a user or consumer when it left the control of the defendant." With regard to the failure of the trial court to provide any specific instruction as to the significance of the defendant's failure to include safety devices, the majority says simply that the "jury was clearly aware of the plaintiffs' various factual theories of why an alleged design defect occurred," *supra* at 62, and that the trial court did not err "in not singling out one particular evidentiary claim as to why the particular design was defective, i.e., failure to include safety devices." *Supra* at 62.

The majority attempts to avalanche the reader with justifications for the trial court's instructions while missing the essential problem: the jury was left without any guidance as to what exactly comprised a design defect. All the jury had was language to the extent that something called a design defect was at issue here and that if such a design defect existed and was unreasonably dangerous, then the plaintiff was entitled to their judgment. But what is a design defect, what relationship does it bear to safety devices, and what must exist before the defect is "unreasonably dangerous"? The trial court provides no guidance to the jury on these pivotal issues and thus leaves the jury essentially to speculate as to what these terms of art ultimately mean.

The issue would, of course, be substantially different if these questions were of the kind meant to be left to juror discretion. However, this is not the case. First, it is clear that under *Farmer v. International Harvester, supra,* the failure to provide safety devices may, without more, comprise a design defect. This requirement derives from the following statement in *Farmer:*

"The intended use of the truck includes within its scope the reasonably foreseeable likelihood that in the normal course of operation a truck may be involved in a collision or other accident; *it is thus the manufacturer's duty to design and manufacture its products so as to eliminate unreasonable risks of foreseeable injury in the event of collision or other impact."*

*Id.* 553 P.2d at 1315 (emphasis added). This failure to provide safety devices was a central element of the plaintiffs' demonstration that the product was defectively designed. The plaintiffs are entitled to have their theory of the case presented to the jury by proper instructions. *See Everton v. Blair, supra.* The jury should not be forced to guess at the significance of a circumstance which is settled in Idaho law.

Similarly, it is clear that "within the context of products liability . . . , the concept of 'unreasonably dangerous' is neither generally understood by jurors nor within their common experience." *Becker v. Aquaslide 'N' Dive Corp.,* 35 Ill.App.3d 479, 341 N.E.2d 369, 377 (1976). The phrase "unreasonably dangerous" has itself spawned an entire line of cases, *see, e.g., Cronin v. J.B.E. Olson Corp.,* 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153 (1972), as well as an entire comment by the very authors of the Restatement who penned it. *See* Restatement (Second) of Torts, § 402A, Comment i. Under such circumstances, it is patently unreasonable to merely toss such a difficult issue into the lap of an untutored jury for resolution. Contrary to the statement by the majority that "the term 'unreasonably dangerous' is itself a definitional term which does not need additional defining," *supra* at 63, that language is a distinct element of a plaintiffs' case in strict liability actions which this Court has defined as a matter of law. *Farmer,* 97 Idaho at 749, 553 P.2d 1306. In *Farmer,* the Court addressed this aspect of a strict liability cause of action, and offered guidance as to how the "unreasonably dangerous" requirement could be properly applied. As the Court stated:

"One further aspect of a plaintiff's case is the requirement that he must prove that the defect in the product rendered it 'unreasonably dangerous.' Restatement (Second) of Torts § 402A, Comment i (1965). *Ordinarily, the evidence indicating the presence of the defect in the*

*product or permitting its inference under all the circumstances will also prove or permit the inference to be drawn that the defective condition of the product made it unreasonably dangerous."*

*Farmer, supra* at 1313 (emphasis added). The plaintiffs' requested jury instruction No. 28 incorporates this holding verbatim. However, the majority contents itself with concurring in an observation by the Minnesota Supreme Court that "the drawing of inferences is a matter of common sense logic and reasoning which the jurors will normally use without express direction or guidance of the court." *Supra,* at 63. This, of course, flies in the face of this Court's own holding in *Farmer,* and once again deprives the plaintiff of the right to have his case presented to the jury, *under Idaho law,* with proper instructions. The trial court erred in not giving plaintiffs' requested instructions 24, A, 28, and 29, and should be reversed.

In addition to the jury instructions, the majority also erred in Part I–B. There it ruled that the trial court did not commit error by abandoning the limitation it originally placed on the use of certain photographs of the chipper admitted to evidence (defendants' Exhibits 124 A–J), and allowing their subsequent use for the purpose of illustrating the chipper's configuration. The majority justifies its conclusion by noting that "the use sought to be made of the photographs by defendant KPS to characterize the general configuration of the Chipmore chipper, was not inconsistent with the court's previous direction that the photographs were not to be considered as evidence of the condition of the B–702 chipper at the time of appellants' injury." *Supra* at 61. In addition, the majority depends on the circumstance that some of the photographs relied upon by the defendants were not unlike other photographs already offered into evidence by both plaintiffs and defendants. Thus, the majority concludes that because "Defendants' Exhibits 124 A through J had already been 'admitted in evidence and [would] eventually go to the jury in any event,' it was not error for the trial court to permit Defendants' Exhibits

124 A through J to be shown to the jury during Mr. Schoeppner's testimony." *Supra* at 61.

The conclusion reached by the majority is patently incorrect on at least two grounds. First, it is widely recognized that:

"While evidence admitted generally is in the case for any legitimate purpose, evidence cannot be used for another and totally different purpose by the party offering it which is offered and admitted for a limited purpose. Where, by express ruling, it is limited to one purpose, without exception, it cannot be used for another purpose. It is manifest that any other rule would result in surprise and injustice."

*American Produce Co. v. Marion Creamery & Poultry Co.,* 214 Or. 103, 327 P.2d 1104, 1108 (1958); *See also* 88 C.J.S. *Trial* § 87, p. 194, and cases cited therein.

In this case the trial court expressly limited the use of the photographs, warning the jury that these photographs "[did] not in any way purport to represent the condition of B–702, that particular chipper, at the time of Mr. McBride's injury." *Supra* at 60. Later, however, when the defendants again sought to display the photographs for the very purpose of generally characterizing the configuration of the chipper at issue and was met by objection of the plaintiffs' counsel that the photographs had been admitted only "for a limited purpose," the trial court stated: "I don't recall any limitation, and I have nothing in my notes indicating such." This is clear error by the trial court and must be reversed.

Second, the trial court's ultimate pronouncement on the matter clearly denied *any* limitation on the use of the photographs as evidence. This contradicted the earlier instruction. A jury which was first instructed by the court that the photographs were only admitted for a limited purpose and later instructed that there was no such limitation is, at best, a confused jury, and, at worst, a jury which is most apt to go with the latest pronouncement. Al-

though this confusion and resultant error might have been corrected by an instruction at the time the case was given to the jury, the trial court refused to give the necessary instruction, though it was requested by the plaintiff.[2] As recently as this term we noted that contradictory instructions on material matters constitute prejudicial error and require reversal. *Umphrey v. Sprinkel,* Idaho, P.2d (1983) (Supreme Court No. 13600, Released October 12, 1983); *Yacht Club Sales & Service, Inc. v. First National Bank of North Idaho,* 101 Idaho 852, 863, 623 P.2d 464, 475 (1980). Absent a showing by defendants that the jury did not consider the photographs in their evaluation of the chipper's condition at the time of the accident—and thus was not material to the jury's verdict—the contradictory instruction would require reversal as a matter of Idaho law.

In this case, it is clear that such a showing could not be made by the defendant. The statement by the trial court disclaiming any limitation on the use of the photographs as evidence was made in front of the jury. The jury could have and quite probably did consider the photographs—taken nearly four years after the accident—as evidence of the chipper's condition at the time of the accident. The photographs were, after all, of the same chipper—a fact which came out in an exchange before the jury. Such a patently improper use of the photographs would clearly have been prejudicial [3] to the plaintiffs and, because we cannot say that such a prejudicial use of the

photographs by the jury did not in fact occur, a new trial must be ordered.

Although I join the majority opinion as to parts IA, D, E and II, I dissent from parts IB and C and dissent from the result.

---

2. Appellant requested that Instruction C be given as follows:

"You have heard evidence relating to the condition of the KPS Chipper in question as it exists today. The time of the accident alleged by plaintiffs was June 24, 1974. In considering the condition of the chipper and the engine, it is to that time, and not another, to which you should direct your attention. You may not utilize or consider evidence of its condition or the condition of any other chipper today in determining its condition in June, 1974, almost five years ago. You may consider the evidence and testimony relating to the chipper's condition slightly before the accident, or slightly after, or at the time of the accident only."

3. Charles Stocks testified as to the following maintenance problems demonstrated by the photographs: (1) the governor belt was inside out and extremely worn so that it could have flipped out and left the machine ungoverned at any time; (2) an engine mounting bolt was missing from the right-hand side of the engine; (3) there were small branches inside the engine compartment; (4) a clevis pin attaching the throttle cable to the governor was backed out almost completely; (5) only four of the normal five drive belts on the chipper were present; (6) all the fan blades showed evidence of being hit by foreign material and one fan blade was bent; (7) the battery was dead; (8) the inside diameter of the shroud was damaged and dented; and (9) the shroud and radiator were loose.